**CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL**

**<u>TO BE FILED UNDER SEAL</u>**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ──────────────────────── | ) |
| PLAINTIFFS UNDER SEAL | ) |
|  | ) |
| v. | ) |
|  | ) |
| DEFENDANTS UNDER SEAL | ) |
| ──────────────────────── | ) |

**Civil Action No.**

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
<u>UNDER 31 U.S.C. § 3729 ET SEQ. AND STATE LAW COUNTERPARTS</u>**

*Counsel for Plaintiffs/Relators*

Stephen A. Weiss
Christopher L. Ayers
SEEGER WEISS LLP
77 Water Street, 26th Fl.
New York, NY 10005
Tel:  212-584-0700
Fax:  212-584-0799

**CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. BNHT LLC, and on behalf of the STATES of COLORADO, CONNECTICUT, THE DISTRICT OF COLUMBIA, FLORIDA, ILLINOIS, INDIANA, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW YORK, OHIO, OKLAHOMA, TEXAS, AND VIRGINIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | Civil Action No. _____ |
| Plaintiffs, | ) **FILED UNDER SEAL** |
| v. | ) ) |
| LIFE SPINE, INC.,  MICHAEL BUTLER, and JOSEPH LOY | ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 ET SEQ., AND STATE LAW COUNTERPARTS

### INTRODUCTION

1.      Plaintiff/Relator, BNHT LLC ("BHNT" or "Relator"), on its behalf and on behalf of the United States of America, and on behalf of the State of Colorado, the State of Connecticut, the District of Columbia, the State of Florida, the State of Illinois, the State of Indiana, the State of Maryland, the State of Massachusetts, the State of New Jersey, the State of New York, the State of Oklahoma, the State of Texas, the State of Ohio, and the State of Virginia (collectively, the "Qui Tam States"), bring this qui tam action against the Defendants, Life Spine, Inc. ("Life Spine" or the "Company"), its owner, founder, President and Chief Executive Officer Michael Butler ("Butler"), and its Executive Vice President of Sales Joseph Loy ("Loy"), (together, Life Spine, Butler, and Loy shall be referred to herein as the "Defendants").

2.      Relator brings this action on behalf of the United States and the Qui Tam States to recover damages and civil penalties under the False Claims Act and State qui tam statutes against Defendants for causing the submission of false or fraudulent claims; for making, using, or causing to be made or used false records or statements material to false or fraudulent claims; and for conspiring to do all of the same.

3.      Relator brings this action against the Defendants pursuant to the qui tam provisions of the following states: the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 et seq. (2010); the Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 et seq. (2014); the District of Columbia False Claims Act, DC Code §§ 2-381.01 to 2-381.09; the Florida False Claims Act, Fla. Stat. § 68.081 et seq. (2000); the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 et seq. (2000); the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7-1 through 5-11-5.7-18; the Maryland False

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-601 et seq. (LexisNexis 2010); the

Massachusetts False Claims Act, Mass. Gen. Laws, Chapter 12, §§ 5A -5O; the New York False

Claims Act, N.Y. State Fin. Law. § 187 et seq. (McKinney 2010); the New Jersey False Claims

Act, N.J.S.A. 2A:32C-1 et seq.; the Ohio Medicaid Fraud Act, R.C. § 2913.40 et seq.; the

Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053.1 through 5053.7; the Texas

Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. (West 2006); and the

Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq. (2011) (collectively,

the "State qui tam statutes" or "Qui Tam Statutes").

4.      In addition, Relator brings this action to recover under the anti-retaliation

provisions of the federal False Claims Act, 31 U.S.C. § 3730(h), the anti-retaliation provisions of

the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/4(g),

and Illinois common law prohibiting wrongful termination in violation of clearly established

public policy.

5.      Relator seeks civil penalties, damages, declaratory relief, injunctive relief and such

other relief as is available under the FCA and/or the State FCAs, and demands a trial by jury for

all claims for which the right to a jury trial is authorized.

6.      This case arises from the Defendants' unlawful participation in (a) the presentment

to the federal government and the Qui Tam States of false or fraudulent claims for payment under

federal health care programs relating to the medical device products designed, manufactured,

marketed and sold by Life Spine, and (b) the making or use of false records or statements material

to the false or fraudulent claims relating to the Life Spine medical device products.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

7.      Life Spine manufactures, markets, and sells a variety of medical device products relating to spine surgery.  Beginning in at least 2016 (and likely since 2004), Defendants have engaged in a variety of fraudulent activities involving Life Spine's medical spine device products.

8.      Defendants have, as part of their fraudulent scheme, engaged an illegal kickback scheme, all part of a successful effort by Defendants to induce third parties (physician and hospitals) to submit false claims to the government for Medicare and Medicaid reimbursement. Paying physicians tens of thousands of dollars or more per year ostensibly for consulting services, these payments were in reality a quid pro quo to increase purchases of Life Spine's products.  Said payments were based entirely on sales potential, and irrespective of fair market value of services provided.  Defendants instituted this sham physician consultant program with the specific intent to induce sales of Life Spine's products by key accounts.

9.      Defendants have unlawfully paid kickbacks to physicians across the United States in exchange for new business or in exchange for continuing to purchase Life Spine's medical products, which has caused the submission of claims for reimbursement that are false because they are tainted by kickbacks.

10.     Defendants' unlawful conduct has had a direct adverse financial impact on Medicare, Medicaid, and other government-funded healthcare programs.

11.     For example, the federal government, primarily through Medicare and Medicaid, pays for many billions of dollars in medical supplies, medical devices and equipment and services annually nationwide.  Defendants knew that the federal government would ultimately pay for a large portion of its medical products sold to its customers.  As such, Defendants are liable for knowingly causing physicians to submit certifications of compliance with the Anti-Kickback Statute and to submit false claims to get government funds paid or approved by the United States.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

## I.   JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730, 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

13.     The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under State laws for the recovery of funds paid by the Qui Tam States, and arises from the same transactions or occurrences brought on behalf of the United States under 31 U.S.C. § 3730.

14.     This Court has personal jurisdiction over the Defendants because, among other things, Defendants transact business in this judicial district and Defendants engaged in wrongdoing in this judicial district.

15.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  The Defendants transact business within this judicial district, and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

16.     The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendants to conceal from the United States its wrongdoing in connection with the allegations made herein.

## II.   PARTIES

### A.   PLAINTIFFS/RELATORS

17.     Plaintiff/Relator BNHT LLC, a Delaware limited liability company, brings this action on behalf of itself, the United States of America and the Qui Tam States named herein.  Its principal place of business is c/o Seeger Weiss LLP, 77 Water Street, New York, NY 10005. Among the members of BNHT are current or former Life Spine employees (referred to herein collectively as "Relators" and individually as "Relator #1", "Relator #2", "Relator #3", and "Relator #4") with personal knowledge of the fraudulent scheme alleged in this Complaint.  The

-4-

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

Relators possess personal knowledge and experience regarding Life Spine's sales promotion activities, including personal contact with the employees and executives of Life Spine who have committed the violations of law alleged herein.  The personal knowledge of BNHT is not distinct from that of the Relators.

18.     Relator #1 was employed as a sales representative of Life Spine when he was wrongfully terminated by the Company after investigating the Company's unlawful activities that resulted in the illegal sale and reimbursement of Life Spine's medical device products.  After learning that physicians' consulting agreements with Life Spine were based on the physicians' sales volume (i.e., use of Life Spine's medical devices in their surgeries), Relator #1 requested copies of consulting agreements between Life Spine and certain physicians in order to verify and confront these activities.  Shortly after making such requests, as a result of Relator #1's internal investigation, Life Spine abruptly terminated his employment.

19.     Relator #2 was employed as a sales representative of Life Spine when he was terminated by the Company.

20.     Relator #3 was employed as a sales representative of Life Spine when he was wrongfully terminated by the Company after urging reforms to prevent the Company from engaging in the unlawful activities that resulted in the illegal sale and reimbursement of the Company's medical device products.  Prior to filing this Complaint, Relator #3 brought allegations of the wrongdoing described in this Complaint (i.e., those relating to the Defendants' kickback scheme and lack of compliance with the Physician Payments Sunshine Act) to the attention of Life Spine's executives.  Relator #3 raised these concerns with Joe C. Loy, Executive Vice President of Sales at Life Spine.  For example, approximately five months before he was terminated, Relator #3 told Loy that the scheme involving the consulting agreements was improper because it did not

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

comply with the Physicians Payment Sunshine Act, violated federal law, and that he would not participate in such activities.  Later, upon discovering that Life Spine still had not complied with the Sunshine Act, and despite assurances by Loy that it would not continue, Relator #3 repeated his concerns to Loy.  Shortly after raising these concerns, as a result of Relator #3's internal reports to members of the executive staff, Life Spine abruptly terminated his employment.

21.     Relator #4 was employed as a sales representative of Life Spine when he was wrongfully terminated by the Company after investigating the Company's unlawful activities that resulted in the illegal sale and reimbursement of the Company's' medical device products.  After learning that physicians' consulting agreements with Life Spine were based on the physicians' sales volume (i.e., use of Life Spine's medical devices in their surgeries), Relator #4 requested copies of consulting agreements between Life Spine and certain physicians.  Shortly after making such requests, as a result of Relator #4's internal investigation, Life Spine abruptly terminated his employment.

22.     The Relators have personal knowledge and experience regarding Defendants' kickback activities, including personal contact with the employees and executives who have committed violations of law alleged herein.  The Relators were personally aware of Defendants' participation in the scheme involving the providing of illegal kickbacks to healthcare providers in exchange for their favorable treatment of its products.

23.     The Relators are an original source of the allegations in this Complaint, and these allegations are not based upon publicly-disclosed information.  Prior to filing this Complaint, they provided the Government with written disclosure of substantially all material evidence and information that they possessed, including numerous documents and a preliminary disclosure statement, in accordance with 31 U.S.C. §§ 3729(a)(7)(A)-(C), 3730(b)(2).

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

B.     **DEFENDANTS**

24.     Defendant Life Spine, Inc. is an S-Corp that was incorporated in Delaware on May 21, 2002 and has its principal place of business in Illinois.  It is a medical device company that is owned, and was founded by, Defendant Michael Butler.  He is its President and Chief Executive Officer.  Life Spine manufactures, designs, develops, and markets implants and instruments, including medical devices and technologies, used in the treatment of spinal diseases.  Life Spine's principal place of business is located at 13951 South Quality Drive, Huntley, Illinois 60142.  Life Spine is a privately-held company and has approximately fifty employees.  Its revenue in 2017 totaled approximately $40,000,000.00.

25.     As described more fully herein, Life Spine is engaged in the manufacture, promotion, distribution, commercialization, and sale of medical device products.  At all times material hereto, Life Spine manufactured, marketed and sold spine-related medical devices throughout the United States, including within this judicial district.

26.     Life Spine manufactures, markets and sells, and marketed and sold, brand-name medical device products that are paid or reimbursed by various government programs, including Medicare, Medicaid, the Department of Defense's TRICARE/CHAMPUS programs, the Department of Veterans Affairs' CHAMP/VA program, and the Federal Employees Health Benefit Plan

27.     Current Life Spine executives with knowledge of the fraudulent activities alleged herein include Butler; Loy; Omar Faruqi, CFO; Rich Mueller, COO; Mariusz Knap, Vice President of Marketing; Jenn Jesse, Manager of Sales Operations and Human Resources; James Fried, Director of Marketing; Ronald Moore, Director of Marketing; Teresa Snyder, Controller/Accounting; and Rick Greiber, Vice President of Business Development.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

28.     Defendant Michael Butler owns a controlling interest in Life Spine and is the principal architect of the kickback schemes.  Butler is an individual who resides in St. Charles, Illinois.

29.     Defendant Joseph Loy is the Executive Vice President of Sales of Spine and central to the kickback scheme.  Loy is an individual who resides in Weatherford, Texas.

## III.   DEFENDANTS' KICKBACK SCHEME

30.     Life Spine lacked a compliance department and had no policies or procedures in place related to the False Claims Act or the Anti-Kickback Statute.  The Company also provided no training, whether formal or informal, related to compliance with the False Claims Act or the Anti-Kickback Statute.

31.     Life Spine's entire business model revolved around kickbacks.  Defendants' kickback scheme involved a business model that incentivized physicians to use Life Spine's medical devices by rewarding them with lucrative consulting agreements and investment opportunities (via warrants for purchase of shares) in Life Spine's business, as an illegal quid pro quo.  In addition, Defendants offered illegal remuneration to the physician-consultants in the form of reimbursement, to induce the physicians to use Life Spine's medical devices while performing certain surgical spine-related procedures.

32.     A central aspect of the kickback scheme involved consulting agreements arranged by Defendants.  Life Spine, and its agents, entered into, or caused to be caused into, improper consulting agreements with physicians through which the physician-consultants agree to "work with Life Spine to teach, train, and/or otherwise consult with respect to [Life Spine] products."  In return, Life Spine agreed to compensate the consultants at rates of at least $500 per hour for their work, depending upon the type of spine-related medical device product reviewed (or other service provided, such as discussing industry trends or assisting in training on the client's products).  Part

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

of the job of a Life Spine physician-consultant is to market and promote Life Spine medical devices

to other surgeons.

33.    For example, the services to be provided by Life Spine physician-consultants under

the "Clinical Education Services Agreement" include the following:

- Participate in scheduled meetings or conference calls with the Life Spine's marketing and clinical personnel regarding indications for and use of the products;

- Participate in scheduled meetings and/or conference calls with Life Spine's marketing and product development personnel regarding labs, workshops, presentations and other teaching event;

- Provide to Life Spine "white papers" or other clinical paper(s) to be used in the training, promotion and marketing of the products;

- Prepare for and conduct dinner presentation meetings to other surgeons regarding the products;

- Conduct training for surgeons, Life Spine managers, employees, and independent distributors regarding the Products;

- In conjunction with other Life Spine's key opinion leaders, develop research papers and manuscripts relating to the Products and make professional presentations and lectures regarding the Products and related technique development;

- Write or assist in the writing and publication of technical papers/monographs/surgical protocols;

- Use his best efforts to participate at the conferences / programs / meetings which Life Spine may attend;

- Cooperate with, lend assistance to and give best efforts to Life Spine in connection with any dispute relating to any Product, including any that may arise after termination or expiration of this Agreement; and

- Execute all documents and perform other acts as required under the provisions of the Agreement or reasonably necessary in connection with what is contained therein.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

34.     Once signed on to consulting agreements, Life Spine physician-consultants agree to majority or exclusive use of Life Spine medical device products in performing surgeries on their own patients.  Many of these patients were covered by a government health-care program, including federal and state Medicare programs.

35.     For those physician-consultants who have substantial sales volume (over $2 million annual sales) to offer Life Spine, Defendants also provide them with below-market warrants for the purchase of shares in the company via a "Patent Application Purchase Agreement".  For example, Defendants granted a Life Spine physician-consultant:

> [A] Warrant for the Purchase of Series D Shares.  The maximum number of shares that may be purchased is 35,000 Shares, at a price of one cent ($.01) per share.  The Warrant shall contain a Put right at $4/share.  Such Warrant shall conform to the Life Spine Shareholder Agreement. The Warrant shall not become valid and executable until one of two conditions is achieved. If Life Spine achieves or surpasses an annual revenue amount of seventy-five million dollars ($75,000,000.00), based on the trailing twelve months, the Warrant shall become valid and executable. Alternatively, if Life Spine undergoes an Initial Public Offering (IPO) of its common equity shares, the Warrant shall become valid and executable.

36.     There is no transfer of intellectual property between a physician-consultant who signs a patent application purchase agreement and Life Spine.  The agreements that the surgeons are parties to involve Life Spine medical device products that are already on the market and selling. The purpose of the agreements is to motivate surgeons to use Life Spine's medical devices.

37.     Surgeons who are Life Spine physician-consultants include those listed as such in **Exhibit A**.

38.     For years, Defendants have engaged in financial arrangements and agreements with physicians whereby the physicians hired by Defendants would use Life Spine's medical devices in their surgeries.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

39.    The medical device products that Defendants characterize as being reviewed and evaluated by physician-consultants are only those produced by Life Spine.

40.    Between 2002 and 2017, the United States Patent Office granted 81 patents to Life Spine, many of which concern its spine-related medical devices.

41.    Although Defendants describe the alleged purpose of the consulting agreements as providing consulting work for Life Spine as described above, Defendants only offers consulting agreements to physicians who agree to use its medical devices in their surgeries and meet certain sales volume.  The consulting relationship is not based on providing any follow-up product review, feedback or evaluation, or other consulting work, but instead based on a tacit condition that the physician-consultants use Life Spine products.  In turn, Life Spine pays the physician-consultants for this work without requiring any such product evaluation, review or feedback.

42.    In other words, the Life Spine consulting positions are sham consulting jobs that are intended to operate as channels for selling Life Spine's medical devices for use in spine-related surgeries on the patients of Life Spine physician-consultants.

43.    While Defendants purported to compensate the physician-consultants for consulting services, Defendants in fact made these payments, and conferred other benefits upon them, as kickbacks to induce the physician-consultants to use Life Spine medical devices in the surgeries performed on the physician-consultants' patients.  These kickbacks were a substantial factor in causing the physician-consultants to use Life Spine's medical devices.

44.    Defendants' characteristic approach to soliciting physicians to use Life Spine's medical devices in their surgeries in exchange for improper consulting arrangements began with Life Spine's sales representatives introducing surgeons with whom they have existing relationships with Life Spine's management team.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

45.     Indeed, as part of the interview process, Defendants have sales candidates identify the physicians with whom they have longstanding relationships and the sales volume for each physician.  Once employed by Life Spine, each sales representative was specifically trained to recruit those physicians with which they have relationships to visit Life Spine's office, participate in cadaver labs, and attend lavish dinners – all to set the stage for the management team to execute its kickback scheme by offering lucrative consulting arrangements on the condition that the physicians use Life Spine's products in their surgeries.  Life Spine sales representatives are trained to specifically ask physicians if they are consulting with any other spinal medical device company and whether they had any interest in being a paid consultant for Life Spine.

46.     After introductory meetings with the physicians, Defendants would schedule meetings where this quid pro quo of offering a consulting relationship on the condition that the physician-consultants use a minimum volume of Life Spine's medical devices in their surgeries would be negotiated.  These meetings also often included the physicians' medical device distributors.  For example, on or about November 30, 2016, after a Life Spine sales representative introduced "Dr. A", based in Austin, Texas to Loy.  Loy met with Dr. A's distributor at the distributor's office in Dallas, Texas.  In the meeting, Loy stated that Dr. A's consulting agreement would be renewable annually and that Dr. A's contract would be renewed only if his Life Spine surgical implant volume was at least $2,000,000.00 annually.  Loy also stated that Dr. A would be expected to submit copies of his weekly surgical schedules to confirm Life Spine's medical devices' market share in Dr. A's surgeries.

47.     Another example of the use of Life Spine's medical devices in surgeries performed by physician-consultants as part of their paid "consulting" work, on or about December 10, 2016, after a Life Spine sales representative introduced "Dr. B," based in El Paso, Texas to Loy.  Loy

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

and Butler met with Dr. B and Dr. B's distributor at Life Spine's office.  While Butler was meeting

privately with Dr. B, Loy met with Dr. B's distributor.  In the meeting with Loy and Dr. B's

distributor, Loy described the requirements for Dr. B's consulting agreement and stated that Dr. B

would have a minimum sales volume of $150,000.00 per month ($1,800,000.00 annually).  Loy

also stated that Dr. B would be expected to submit copies of his weekly surgical schedules to

confirm Life Spine's medical devices' market share in Dr. B's surgeries.

48.     Following the December 10, 2016 meetings with Martin and Dr. B, on or about

February, 22, 2017, Dr. B's distributor emailed Loy and copied Mitch White, Life Spine's Vice

President of Sales, concerning Dr. B's consulting relationship.  Martin stated:

> Per the discussion we had in your office in December 2016, you, []
> and I had; you tried to tie my contract to the volume of [Dr. B] to
> the [Dr. B's distributor's] commissions as well as the warrants
> offered by your company. Finally, in our discussion last week that
> involved Mitch White, you and myself; ***you clearly stepped over the
> line after you told me that [Dr. B] needed to do more volume for
> the company because Life Spine was engaging him***. Your decision
> to engage [Dr. B] as a consultant should have no impact on my
> commissions or volume that [Dr. B] is doing with your company but
> rather his talents as a surgeon and educator should be the deciding
> factor.  All of these instances that I have mentioned clearly put all
> interested parties at risk based on federal statutes that do not allow
> for remuneration based on surgical volume and furthermore prevent
> Life Spine and [Dr. B's distributor] from being contractually
> engaged. (Emphasis added.)

49.     As another example, on or about September 23, 2017, after a Life Spine sales

representative introduced "Dr. C," based in Oakland, California to Knap, Knap met with Dr. C and

his medical device distributor for dinner at Kobe Steak Restaurant in San Francisco, California.

At the dinner meeting, Knap stated that, in exchange for the consulting agreement with Life Spine,

Dr. C would have to maintain a minimum sales volume of $150,000.00 per month ($1,800,000.00

annually).  Knap also stated that Dr. C would be expected to submit copies of his weekly surgical

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

schedules to confirm Life Spine's medical devices' market share in Dr. C's surgeries.  Following

the dinner meeting, Dr. C began using Life Spine's medical devices in his surgeries and performed

his first surgery using Life Spine's Prolift the very next week.  Ultimately, Dr. C declined to consult

for Life Spine.

50.     Also significant about the September 23, 2007 dinner is that the bill for four people

exceeded $2,000.00.  Knap added additional names, Brian Luman and Nik Valcic (individuals who

did not attend the dinner), to the expense report to offset the high amount of the bill.

51.     On or about October 26, 2017, after a Life Spine sales representative introduced

"Dr. D," based in Providence, Rhode Island, to Knap, Knap met with Dr. D at the North American

Spine Society ("NASS") conference.  During Knap's meeting with Dr. D, Knap stated that Dr. D

could consult for Life Spine on the condition that Dr. D would have to maintain a minimum sales

volume of $150,000.00 per month ($1,800,000.00 annually).  While $150,000.00 in monthly sales

would be the minimum to continue the consulting relationship, Knap advised Dr. D that he should

target $200,000.00 in monthly sales volume.  Dr. D told Knap that he would use Life Spine

products surgeries he performed if Life Spine invested money in his research company.  In or about

November 2017, Knap met again with Dr. D in Rhode Island where this quid pro quo was also

discussed.  At that time, Knap advised Dr. D that Life Spine could not invest in his company, but

would sign Dr. D to the lucrative consulting arrangement.

52.     Additionally, the Relators were also told by other sales representatives at Life Spine

that other Life Spine physician-consultants' consulting relationship with the Company were based

on the same condition that the physician-consultants meet certain sales volume to become or

remain a consultant for Life Spine.  Former Life Spine sales representatives and employees with

knowledge of Defendants' kickback scheme include Amanda Rains, Director of Marketing; Rita

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

Patel, Director of Marketing; Jason Grumbacher, Great Lakes (Indiana) AVP; Trevor Martin, Mountain States (Utah) AVP; David Mayo, Southeast AVP (Florida); Don Jack, Northeast AVP (Maryland); Ken Lytle, MidAtlantic AVP (Virginia); Steve Froelich; RM / Surgeon Trainer (Florida); Chris McMahon, Northwest AVP; Brad Coy, Central AVP (NE); David Rivera, New York AVP; Scott Lehigh, Vice President East; and Mitch White, Vice President West.

53.     On various occasions, Loy would email and text sales representatives instructing them to speak with Life Spine physician-consultants and find out why the physician-consultants are not meeting their monthly sales volume quotas.  For example, between October 2016 and January 2017, Loy sent Relator #2 text messages about Dr. E based in Springfield, Illinois.  The text messages stated that Dr. E's monthly sales volume was only $120,000.00 and that he was not meeting his quota of $150,000.00.  Loy instructed Relator #2 to obtain copies of Dr. E's weekly surgery schedules to confirm Life Spine's medical devices' market share in Dr. E's surgeries. Relator #2 was also instructed by Loy at that time to provide weekly updates to Loy until usage increased.

54.     In another text message, on August 12, 2016, Loy states "Yes – press him [a physician-consultant] to end a yr from now at $3M run rate – so 12 mos. from now monthly quota should be $250k".

55.     Life Spine's management team, including Loy, Knap, Fried, Moore, and Jesse, prepared the terms and conditions for each consulting arrangement, including which projects the physician-consultants would participate and amounts to be paid to each physician-consultant.

56.     Life Spine's management team, including Faruqi, Snyder, and Kennedy, were responsible for payments to physician-consultants surgeons and reporting of consultant pay.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

A.    **LIFE SPINE'S CONSULTANT AGREEMENTS DO NOT FALL WITHIN THE SAFE HARBOR PROVISIONS OF THE ANTI–KICKBACK STATUTE OR STARK LAW**

57.    The consulting agreements do not fall within the safe harbor provisions set forth by the Anti-Kickback statute's regulations.

58.    The consulting agreements do not set forth in advance the aggregate amount of compensation paid to the consultant over the term of his employment, but instead indicate that consultants are paid on an hourly rate basis, depending upon the type of service provided or the type of surgery provided (all of which involve Life Spine medical devices).    Thus, the compensation arrangement, since the hours of service can vary, does not qualify for safe harbor protection.

59.    The consulting agreements are intended to provide for services on a periodic, sporadic or part-time basis, rather than on a full-time basis, and they fail to specify exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

60.    Although the consulting agreements provide for the services to be performed by the physician-consultants, Life Spine's physician-consultants' actual job duties, for which they are compensated by Life Spine, include performing such surgical work involving Life Spine medical devices.    Thus, the consulting agreements do not cover all of the services the consultants provide for the term of their agreements and do not specify the services to be provided by the consultants.

61.    The aggregate services performed under the consulting agreements by the physician-consultants exceed those which are reasonably necessary to accomplish the commercially reasonable business purposes of the consulting service.    As set forth above, the physician-consultants perform as part of their job duties surgeries involving Life Spine products.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

## B.   DEFENDANTS' CONDUCT WAS AIMED AT SHIELDING ITS VIOLATIONS OF FEDERAL LAW

62.     One of the central precautions employed by Defendants in connection with their kickback scheme is that none of the consulting agreements through which Life Spine enters with numerous surgeons and puts on their payroll expressly identify this quid pro quo relationship discussed above.  Specifically, all discussions regarding establishing a consulting relationship with physicians on the condition that they use Life Spine's product in their surgeries is only discussed in person and not memorialized to Relators' knowledge.

63.     Life Spine's management team limits access to the consulting agreements with physician-consultants.  Life Spine's sales representatives do not have authority to access such documents.

64.     In this regard, the purpose of the consulting agreement scheme was not only to grow the revenues of Life Spine's business, but also to avoid compliance with the reporting requirement of the Physicians Payment Sunshine Act, 42 U.S.C.A. § 1320a-7h.  And by avoiding compliance with the Sunshine Act, Defendants sought to avoid liability under the False Claims Act and the Anti-Kickback statute.

## C.   LIFE SPINE'S SALES REVENUES DERIVED FROM MEDICAL DEVICES THROUGH THE PHYSICIAN-CONSULTANTS

65.     The physicians-consultants employed by Life Spine generated substantial revenues as a result of sales of the Company's spinal medical devices for use in surgical procedures they performed.

66.     For example, the Relators estimate that physician-consultants perform 20 to 30 surgeries per month.  In fiscal year 2016, physician-consultants billed as much as $14,490 per surgery for Life Spine's medical devices.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

D.     THE RELATORS' ATTEMPTS TO INVESTIGATE AND
       <u>REFORM LIFE SPINE</u>

67.     As part of their employment with Life Spine, the Relators' job was to manage the Company's sales business.  The Relators learned that Life Spine was entering into illegal quid pro quo arrangements with physician-consultants hired by Life Spine.  The Relators knew that Life Spine was not complying with the Sunshine Act by reporting the consulting agreements and related remuneration as required by that federal law.

68.     About five months before Relator #3 was terminated, as part of his effort to reform the Company, Relator #3 contacted Loy in an effort to have Life Spine stop the illegal conduct associated with the kickback scheme, including Life Spine's failure to comply with the Sunshine Act.

69.     Relator #3 pushed back against the consulting arrangement, and advised Loy that it was illegal to pay physicians to use Life Spine's product in their surgeries and that he would not be associated with such conduct.  Loy indicated that he would implement changes at that time.

70.     After learning that Loy had not implemented changes and the illegal conduct continued, Relator #3 repeated his concerns to Loy on or about January 9, 2017.  Rather than expressing gratitude to Relator #3 for coming forward and seeking to reform the company, on January 10, 2017, Life Spine terminated Relator #3's employment and sent an email to the company stating Relator #3's employment was terminated due to "insubordinance."

71.     Similarly, after Relator #1 and Relator #4 learned of Defendants' kickback scheme, in or about December 2017, they each requested copies of the consulting agreements between physician-consultants and Life Spine in an effort to investigate Defendants' illegal conduct.

72.     When Defendants learned of Relator #1's and Relator #4's investigative activities, Life Spine terminated both of their employment.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

73.     Defendants' retaliatory acts were, not coincidentally, taken shortly after Relator #1, Relator #3, and Relator #4 raised their concerns about the illegal conduct.  Defendants' wrongful termination of the Relators was made in violation of the False Claims Act's prohibition against such retaliation.  See 31 U.S.C. § 3730(h).

### E.     DEFENDANTS' ILLEGAL KICKBACK SCHEME VIOLATED FEDERAL LAW

74.     Defendants' illegal kickback scheme has caused numerous false claims to be submitted to federal and state healthcare programs throughout the United States, and constitutes a violation of the Anti-Kickback and Stark statutes.  Defendants' misconduct cheated the federal and state governments out of hundreds of thousands of dollars that should not have been paid, thereby illegally enriching the Defendants at taxpayer expense.

75.     At all relevant times, Defendants have known that Life Spine's spine-related medical devices were being paid for or reimbursed by Government Programs, including Medicaid and Medicare Part B.  Defendants supervised the kickback scheme and knew that Medicare, Medicaid, and other federal program beneficiaries represent a significant percentage of spine-surgery patients, and that as a result of the kickbacks, doctors across the country had performed spinal surgeries on Medicare and Medicaid patients using Life Spine's medical devices.

76.     Approximately eighty percent (80%) of all medical devices approved by the FDA are covered by Medicare.  Moreover, Medicare spends more than $20 billion per year on Implantable Medical Devices ("IMD") as part of its Part A (hospital insurance) budget, and Part A payments increased 4.3% each year from 2004 to 2009 according to the US Government accountability Office (cumulatively, a 52% increase since 2002).  Medicare Part A payments for IMDs between 2006 and 2014 increased 32.6% alone.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

77.     The largest users of medical devices are the elderly, people 65 years-old or older, who are covered by Medicare.  Elderly populations (those over 65 and otherwise eligible) are the largest consumer of orthopedic medical devices.  And most spinal implant surgeries are performed to treat degenerative disease that occurs in the elderly, namely, osteoarthritis.

78.     Defendants knew, or reasonably should have known, that their conduct described herein would lead to the submission of claims for reimbursement by government programs that were not eligible for reimbursement.  But for Defendants' illegal conduct, reimbursement for the use of Life Spine's medical device products would not have occurred.  As a result, Defendants have caused, and continues to cause, the submission of false claims to government programs, and it has benefited from the payment of those false claims.

79.     The fraudulent kickback scheme served its intended purpose, as it has induced physicians to seek reimbursement for surgical procedures involving Life Spine's medical device products.  The government programs did, in fact, reimburse those claims based on Defendants' illegal kickback scheme.

80.     The fraudulent kickback scheme has caused substantial claims for reimbursements of Life Spine's medical device products to be submitted for reimbursement by Government Programs. The Government Programs did, in fact, reimburse those claims.

81.     At least in part as a result of Defendants' illegal kickback scheme, Defendants' medical device products have been heavily used for the treatment of Medicaid, Medicare Part B, Medicare Part D, and other government program participants.

F.      **PROVIDER AGREEMENTS AND HOSPITAL COST REPORTS SUBMITTED FOR REIMBURSEMENT FROM MEDICARE**

82.     In order to establish eligibility for Medicare reimbursement, health care providers and hospitals must sign mandatory Medicare Enrollment forms known as CMS 855 (the "Provider

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

Agreement"). Within the CMS 855 form, the services rendered must be identified by entering the relevant HCPCS code. In signing the Form CMS–855, providers and hospitals agree to comply with all Medicare laws, regulations, and program instructions, including the Anti–Kickback Statute, as a precondition of Medicare payment. The certification of compliance with these requirements that is contained in the Provider Agreement and to which health care providers and hospitals attest in signing the form reads:

> I agree to abide by the Medicare laws, regulations and program instructions that apply…. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Form CMS–855A; Form CMS–855I. The Provider Agreement further states that this certification is one of the "requirements that the provider must meet and maintain in order to bill the Medicare program." Form CMS-855A.

83. Hospitals, but not doctors, must submit a Hospital Cost Report along with their claim for reimbursement for Medicare. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. The Hospital Cost Report includes the following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

CMS Form 2552-10. The person certifying the report is required to sign a statement which reads:

> To the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable

-21-

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

84.     In reimbursing hospitals for operating costs, Medicare pays according to a per-patient standardized rate, called the Diagnostic Related Group ("DRG") rate.   42 U.S.C. § 1395ww(d)(3)(A), (D). The hospital submits a claim for a surgery by identifying the DRG associated with the surgery. The DRG reimbursement rate is "intended to fairly compensate the hospital for all costs associated with the surgery, including the medical device costs."

### G.     THE PRESENTATION OF FALSE CLAIMS TO THE GOVERNMENT

85.     As part of the kickback scheme discussed above, health care providers who worked as Life Spine physician-consultants for the Company entered into such Provider Agreements, pursuant to which each provider was induced to submit at least one false claim to the Medicare Program for performing surgical procedures involving Life Spine's medical devices, and that was paid for by Medicare.

86.     As another result of the kickback scheme discussed above, hospitals in which Life Spine physician-consultants performed surgeries involving Life Spine's medical devices entered into the aforementioned Provider Agreements and Hospital Cost Reports, pursuant to which each such hospital submitted at least one false claim to the Medicare Program in connection with such surgical procedures involving Life Spine's medical devices, and for which each such hospital was reimbursed by Medicare.

## IV.     LIFE SPINE'S ILLEGAL TERMINATION OF RELATOR #1, RELATOR #3, AND RELATOR #4

87.     Life Spine terminated Relator #1, Relator #3, and Relator #4 in direct retaliation for their investigative activities and having come forward to report the Defendants' kickback and Sunshine Act violations.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

88.     Life Spine's abrupt termination of Relator #1's, Relator #3's, and Relator #4's employment, as detailed above, was improper under federal law.  As the facts set forth above also show, Defendants knew that Relator #1, Relator #3, and Relator #4 were engaged in conduct protected under the FCA.

89.     Life Spine also took adverse employment action against Relator #1, Relator #3, and Relator #4 in the form of their termination as a direct response to their protected activities.  Until they were terminated, Life Spine never informed Relator #1, Relator #3, or Relator #4 that they had any performance issues.  To the contrary, as noted above, Life Spine highly valued Relator #1, Relator #3, and Relator #4, and expressed this sentiment to them on more than one occasion.

90.     Relator #1's, Relator #3's, and Relator #4's efforts to alert executives at Life Spine that its conduct was illegal reasonably could have led to an FCA action, because proof that Defendants' kickback scheme, and failure to comply with the Sunshine Act, caused false claims to be submitted to the government would demonstrate a violation of the FCA.

91.     As a direct and proximate result of this unlawful retaliation, Relator #1, Relator #3, and Relator #4 have suffered emotional pain and mental anguish, together with serious economic hardship.

## V.     THE UNITED STATES AND QUI TAM STATES WERE CHEATED OUT OF SUBSTANTIAL SUMS AS A RESULT OF THE FALSE REPORTS INDUCED BY DEFENDANTS' KICKBACK SCHEME

92.     Because Defendants intentionally intended that false reports be submitted to the Government, Government was wrongfully overcharged for reimbursement of the Company's medical device products.

93.     Defendants knowingly (with actual knowledge of the information, and acting in deliberate ignorance, or reckless disregard, of the truth or falsity of the information) made, used,

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

94.     By virtue of the false or fraudulent claims that Defendants knowingly caused to be presented, the United States and the Qui Tam States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

## VI.     STATUTORY AND REGULATORY ENVIRONMENT

### A.     THE FALSE CLAIMS ACT

95.     The federal False Claims Act ("FCA") was originally enacted during the Civil War, and was substantially amended in 1986 and 2009. Congress enacted these amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

96.     The FCA imposes liability on any person who "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" to an officer or employee of the United States government. 31 U.S.C. § 3729(a)(1)(a) (2008).  The statute further imposes liability on a person who (1) uses, or causes to be made or used a false record or statement material to get a false or fraudulent claim paid or approved by the Government; (2) conspires to defraud the government by getting a false or fraudulent claim paid or approved by the government, or (3) uses a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government.  Id. at 3729 §§ (a)(1)(b)-(g).  To satisfy the statute's knowledge requirement, a person must "(1) ha[ve] actual knowledge of the information; (2) act[] in deliberate

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

ignorance of the truth or falsity of the information; (3) or act[] in reckless disregard of the truth or falsity of the information," but "no specific intent to defraud" is required. Id. § 3729(b).

97.    The FCA does not create a private cause of action, but permits a person, designated a "Relator" to bring a civil action "for the person and for the United States government . . . in the name of the government." 31 U.S.C. § 3730(b).

98.    Liability under these FCA provisions is a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

99.    A "claim" means any request or demand for money or property provided by the Government under one of its programs, such as Medicaid.  31 U.S.C. §§ 3729(b)(2). Claims made to the states are actionable under the FCA if the Government will reimburse the state for any portion of the claim. 31 U.S.C. § 3729(b)(2)(A).

### B.    THE FCA'S AND ILLINOIS'S ANTI-RETALIATION PROVISIONS AND STATE COMMON LAW PROHIBITING RETALIATORY DISCHARGE

100.    The FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), prohibits discrimination against a person in the terms and conditions of employment because of that person's efforts in furtherance of an action under that statute or efforts to stop one or more violations of the federal False Claims Act.   A person retaliated against in violation of this section is entitled to reinstatement, double the amount of lost back pay, interest on the back pay, and special damages, including attorney fees and litigation costs.

101.    The anti-retaliation provision of the Illinois False Claims Whistleblower Reward and Protection Act, 740 ILCS 175/4(g), is similar to the FCA's anti-retaliation provision and protects efforts to stop violations of the Illinois False Claims Whistleblower Reward and Protection Act, 740 ILCS 175/3.  It is unlawful to discriminate against an employee because of lawful acts

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

done by the employee in furtherance of an action under 740 ILCS 175/4(g), or because of other efforts to stop a violation of 740 ILCS 175/3.

102.     Additionally, under the common law of Illinois, an employer cannot terminate an at-will employee where to do so would violate a clearly mandated public policy (such as the public policy underlying the Illinois False Claims Whistleblower Reward and Protection Act of reporting fraud on the state of Illinois).

### C.     THE ANTI-KICKBACK STATUTE

103.     The Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), arose out of a Congressional concern that payoffs to those who influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

104.     The Anti-Kickback statute prohibits any person or entity from offering or providing "any remuneration" to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment is sought from under any federally-funded health care program, including Medicare, Medicaid, and TRICARE.  42 U.S.C. § 1320a-7b(b).  Violation of the statute can subject the perpetrator to criminal and civil penalties, as well as exclusion from participation in federally-funded healthcare programs.

105.     The term "remuneration" includes anything of value, in whatever form, whether in cash or in kind, or offered directly or indirectly.

106.     Payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

107.    Thus, the AKS prohibits medical device manufacturers or suppliers from offering to pay any remuneration, if one of the purposes of the remuneration is to induce physicians or others to recommend or use products paid in whole or in part by federal healthcare programs.

108.    Examples of activities prohibited by the AKS include payments for sham consulting services, bogus research and educational grants, travel and lodging expenses, expensive meals and wine, and other gifts and discounts.  These activities are especially suspect if the medical device supplier selects the physician based on its belief that the physician is likely to prescribe the company's products, rather than on the physician's professional qualifications or services he or she actually rendered to the company.

109.    The AKS provides safe harbor provisions for personal service arrangements, 42 C.F.R. § 1001.952(d), which, as discussed above, Defendants does not satisfy.

110.    Each of the federally-funded health care programs requires every provider and supplier providing items and services for federal healthcare beneficiaries to promise and ensure compliance with the AKS as a material condition of payment of the resulting claims.

111.    A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act.  42 U.S.C § 1320a-7b(g).

112.    Giving a person the opportunity to earn money for referring patients may constitute an inducement under the AKS.

113.    As stated by the Office of Inspector General of the Department of Health & Human Services ("OIG") with respect to medical device suppliers:

> Manufacturers, providers, and suppliers of health care products and services frequently cultivate relationships with physicians in a position to generate business for them through a variety of practices, including gifts, entertainment, and personal services compensation arrangements. These activities have a high potential for

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

fraud and abuse and, historically, have generated a substantial number of anti-kickback convictions. There is no substantive difference between remuneration from a pharmaceutical manufacturer or from a durable medical equipment or other supplier--if the remuneration is intended to generate any federal health care business, it potentially violates the anti-kickback statute.

OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003).

114.　As discussed above, federal health care programs require every provider, hospital, and supplier who provides items and services to federal healthcare beneficiaries to sign Provider/Supplier Agreements, and Hospital Cost Reports, to establish their eligibility to seek reimbursement.

115.　The express language of the AKS, the certification of the provider/supplier agreements and hospital cost reports, and the repeated statements of the agency charged with administering the statute establish without question that compliance with the AKS is material to decision to pay claims for federal program beneficiaries.

116.　Compliance with the AKS is a material condition of payment under all publicly-funded healthcare programs, including Medicare, Medicaid, CHAMPUS-TRICARE, CHAMPVA, Federal Health Benefit Program, and other federal and state health care programs (hereinafter referred to as "government healthcare programs").

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

### D.   THE STARK STATUTE

117.   The Stark Statute, 42 U.S.C. § 1395nn, prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity with which he or she (or an immediate family member) has a financial relationship, unless an exception applies. The statute also prohibits the entity from billing Medicare for those referred services. The Center for Medicare and Medicaid ("CMS") has promulgated regulations interpreting the statute.

118.   A financial relationship under the Stark laws includes arrangements involving any remuneration between a physician (or an immediate family member of such physician) and an entity.  42 U.S.C. §§ 1395nn(a)(2)(B), (h)(1)(A).

119.   A "referral" includes, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare...." 42 C.F.R § 411.351.  A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

120.   Claims submitted in violation of the Stark Statute are ineligible for payment, and violate material conditions of payment of federal healthcare programs.

121.   A claim for payment that is based on a violation of the Stark Statute constitutes a false claim under the FCA.

### E.   THE PHYSICIANS PAYMENTS SUNSHINE ACT

122.   Regulatory scrutiny of the medical industry has also increased with the enactment of the Physician Payments Sunshine Act and the Patient Protection and Affordable Care Act in 2010.  Financial relationships between physicians and medical device companies can create negative influences on physician judgment that compromise patient care and jeopardize the public's trust.  In response to these concerns, when Congress passed the Sunshine Act in March

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

2010, it seized the opportunity to mandate greater transparency regarding these financial relationships by including the Sunshine Act.

123.     These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning August 1, 2013.  It is applicable to manufacturers of prescription drugs, devices, biologicals and medical supplies requiring pre-market approval or notification and products covered under Medicare, Medicaid or the Children's Health Insurance Program ("CHIP").

124.     Specifically, the Physician Payments Sunshine Act ("PPSA" or "Sunshine Act")—also known as section 6002 of the Affordable Care Act (ACA) of 2010—requires medical device manufacturers to disclose to CMS any payments or other transfers of value made to physicians or teaching hospitals.  42 C.F.R. § 403.904.  It also requires certain manufacturers and group purchasing organizations (GPOs) to disclose any physician ownership or investment interests held in those companies.  42 C.F.R. § 402.906.  Another broad category of reporting covers research payments. This includes any payment made for participation in preclinical research, clinical trials, or other product development activities.  42 C.F.R. § 403.904(f).

125.     As a whole, the Sunshine Act seeks to help make financial relationships clearer by providing a central location for financial interactions to be reported and monitored.  Furthermore, it is meant to discourage "dishonest influence on research, education, and clinical decision-making."

126.     Unlike other state and federal laws governing the health care industry, the Sunshine Act depends on self-reporting instead of relying on whistleblowers and government investigators. In particular, the program requires "applicable manufacturers" and "applicable GPOs,"

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

collectively deemed "Reporting Entities," to report to CMS any payment or transfers of value made to physicians and teaching hospitals.  Applicable manufacturers, such as medical device manufacturers, are required to report all payments falling into the following categories:

> consulting fees, compensation for services other than consulting, including serving as faculty or as a speaker at an event other than a continuing education program, [h]onoraria, [g]ifts, [e]ntertainment, [f]ood and beverage, [t]ravel and lodging, [e]ducation, [r]esearch, [c]haritable contributions, [r]oyalty or [l]icense, [c]urrent or prospective ownership or investment interest, [c]ompensation for serving as faculty or as a speaker for an unaccredited and non-certified continuing education program, [c]ompensation for serving as faculty or as a speaker for an accredited or certified continuing education program, [g]rants, [and] [s]pace rental or facility fees (teaching hospital only).

78 Fed. Reg. 9457, 9477-9481 (February 8, 2013): 42 CFR 402 (as specified by Pub. L. No. 111-148 § 6002, (2010) (codified at 42 U.S.C.A § 1128G(a)(1)(A)(vi) (West Supp. 2011)).

127.    Sunshine Act penalties are severe and include civil monetary penalties of up to $10,000 for each item not reported. There is an annual maximum of $150,000 with respect to each annual submission. If a company knowingly fails to accurately and completely report a payment or ownership interest, the penalty is up to $100,000 for each item with an annual maximum of one million dollars.  42 C.F.R. § 912.

## VII.   REIMBURSEMENT BY GOVERNMENT-FUNDED HEALTH CARE PROGRAMS

128.    The Health Insurance for the Aged and Disabled Program, popularly known as Medicare, was created in 1965 as part of the Social Security Act (SSA). The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Studies ("CMS"), a component of HHS.

129.    The Medicare program consists of two primary parts. Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care.  42 U.S.C. §§ 1395c to 1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

percentage of the fee schedule for physician services as well as a variety of other "medical and other services."  42 U.S.C. §§ 1395j to 1395w-5.

130.    The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The federal share of each state's Medicaid expenditures varies by state.

131.    Various other federally-funded medical coverage programs exist to help discrete populations of enrollees obtain medical care, including the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Veterans Administration, among others.

132.    Reimbursement practices under all federally-funded healthcare programs closely align with the rules and regulations governing Medicare reimbursement.

133.    Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the carriers act on behalf of CMS.  42 C.F.R. § 421.5(b) (1994).

134.    To participate in the Medicare Program, a health care provider must file a provider agreement with the Secretary of HHS.   42 U.S.C. § 1395cc.   The provider agreement requires

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

compliance with the requirements that the Secretary deems necessary for participation in the Medicare Program and in order to receive reimbursement from Medicare.  The provider agreement specifically requires compliance with the federal Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(b).

A.    **MEDICARE PART A**

135.    Part A of the Medicare program authorizes payment for institutional care, including hospitalization, for eligible patients.

136.    Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health items and services to treat Medicare patients.  The hospital, also called a "provider," is authorized to bill Medicare for that treatment.

137.    During the relevant time period, CMS reimbursed hospitals for impatient Part A services through Medicare Administrative Contractors ("MACs").

138.    MACs are private insurance companies that are responsible for determining the amount of payments to be made to providers.  See 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006). Under their contracts with CMS, MACs review, approve, and pay Medicare bills, called "claims," received from hospitals.  See 42 C.F.R. § 421.5(b).

139.    Since 2007, in order to get paid, Hospitals must submit claims for payment on Form CMS-1450, also called Form UB-04.  This form contains patient-specific information including the diagnosis and type of services that are assigned or provided to the Medicare patient.  The Medicare program relies upon the accuracy and truthfulness of the UB-04 Forms to determine whether the service is payable and what amounts the hospital is owed.

140.    In addition, and at the end of every fiscal year, as a prerequisite to payment, CMS requires hospitals to submit to the MAC a form CMS-2552, commonly known as the hospital "cost report."  42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. The cost report identifies any outstanding costs that the hospital is claiming for reimbursement that year.  It serves as the final claim for payment

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

that is submitted to Medicare.  The Medicare program relies upon the accuracy and truthfulness of the cost report to determine what amounts, if any, the hospital is owed, or what amounts the hospital has been overpaid during the year.

141.    In 1983, Congress established the prospective payment system ("PPS") as the system by which hospitals are reimbursed for inpatient hospital costs.  Under PPS, the amount Medicare pays a hospital for treating an inpatient Medicare beneficiary is based in large part on the particular condition that led to the patient's admission to, or that was principally treated by, the hospital.

142.    Under PPS, a patient's illness or condition is categorized under a classification system called a diagnostic related group ("DRG").  The DRG establishes how much the hospital will be paid under Medicare and reflects the resources the patient's condition or treatment typically requires.  The MAC uses the patient specific information (for example, the diagnosis codes) submitted by the hospital on the UB-04 to determine what DRG is assigned to a certain claim, and hence, what amount will be paid.

143.    The DRG is intended to reimburse the hospital for the expected costs of any items that it must purchase in connection with the hospitalization.  The DRG is intended to compensate the hospital for any spinal implants, where those devices are appropriately used to treat a Medicare beneficiary.

B.    **MEDICARE PART B**

144.    Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury.  Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums.  Payments under Medicare Part B are typically made directly under assignment

-34-

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

to service providers and practitioners, such as physicians, rather than to the patient/beneficiary.  In that case, the physician bills the Medicare Program directly.

145.    The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS.  To assist in the administration of the Medicare Part B Program, CMS contracts with MACs.  42 U.S.C. § 1395u.  MACs are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

146.    Medicare reimburses physicians for their professional services under Part B of the program, pursuant to a Physician Fee Schedule ("PFS"). 42 C.F.R. § 414.58(a). Physician fees under the PFS are determined according to a standardized coding system assigned to procedures set forth in the Health Care Financing Administration's Common Procedure Coding System (HCPCS).

147.    Under the HCPCS, the standardized codes called CPT codes are maintained by the American Medical Association, and the CPT code set was adopted by CMS for the reporting of services under Part B of the Medicare program.  The CPT code set accurately describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.

148.    The CPT code assigned to a medical procedure determines the payment amount to the physician under Part B. The payment amount for each service paid under the Physician Fee Schedule ("PFS") is " the product of three factors-(1) a nationally uniform relative value for the service; (2) a geographic adjustment factor for each physician fee schedule area; and (3) a nationally uniform conversion factor (CF) for the service." Final Rule, 68 Fed. Reg. 63195, 63198 (November 7, 2003).  For each physician service, there are three relative values: for physician

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

work; for practice expense; and for malpractice expense. Id.  These are referred to as Relative

Value Units ("RVU's"). The work RVU's are based on national valuations of physician time

expended for a particular service, and can be accessed on CMS's website in published schedules.

149.    Thus, the DRG system establishes standardized payments for Part A (inpatient)

services, and the CPT system established a standardized payment amount for physician services,

based on evaluation of the actual average costs of performing that procedure, by region and type

of provider, as reported by providers annually.

150.    Physicians submit claims for their professional services to Part B of the program

on Form CMS-1500.

### C.   REIMBURSEMENT FOR SURGERIES USING THE MEDICAL DEVICES AT ISSUE

151.    Costs associated with spine surgery utilizing medical devices are separately billed

by the hospitals and surgeons to payors, including Medicare, Medicaid, and TRICARE.

152.    Hospitals submit claims to federal programs for the inpatient costs associated with

the surgeries, including the cost of the medical devices, on interim claims forms called Forms

CMS-1450 (formerly UB-92's) and hospital cost report forms (the final claim).  Hospital claims

identify the DRG associated with the surgery, which CMS uses to determine the payment amount

to the hospital, to include payment for the medical devices used during the surgery.

153.    DRG codes are calculated in a manner intended to fairly compensate the hospital

for all the costs associated with the surgery, including the medical device costs.  DRG rates are

recalculated annually based on, among other things, actual claims data.

154.    The surgeon performing the surgical procedure separately bills for his or her

professional services on a Form CMS-1500, identifying the surgical procedure by the appropriate

CPT code.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

155.    Each surgeon chooses which manufacturer's spine hardware to use in each surgery. However, the devices utilized in a spinal surgery are generally purchased by the hospital from the manufacturer.

156.    The surgical devices used in spinal surgery include various products that are used to stabilize an injured or degenerating spine.  Products used in cervical spinal surgery (neck) include anterior cervical plates and screws, lateral mass screws and rods, laminoplasty plates and screws and bone products, such as bone spacers or cellular bone matrix.  Products used in lumbar spinal surgery (lower back) generally consist of pedicle screws and rods, interbody devices such as peek spacers, or corpectomy devices such as mesh spacers, anterior buttress plates and some bone products such as bone spacers and cellular bone matrix.

### D.    COMPLIANCE WITH THE AKS AND THE SUNSHINE ACT IS A CONDITION OF PAYMENT

157.    Compliance with the Anti-kickback Statue and the Sunshine Act is a condition of payment for federally-funded healthcare programs, including Medicare, Medicaid, and TRICARE, meaning that if a provider tells CMS or its agent that it provided services in violation of the Anti-kickback Statute or the Sunshine Act, CMS will not pay the claim.

158.    Hospitals and physicians enter into a Provider Agreement with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from federal health care programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and

**CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION**
**PRIVILEGE – MATTER TO BE FILED UNDER SEAL**

the Stark law), and on the [provider's] compliance with all
applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I.

159.    When a hospital submits a claim for payment, it does so subject to and under the

terms of its certification to the United States that the services for which payment is sought were

delivered in accordance with federal law, to include without limitation the Anti-kickback Statue

and the Sunshine Act.

160.    When a physician submits a claim for payment, he or she does so subject to and

under the terms of its certification to the United States that the services for which payment is

sought were delivered in accordance with federal law, to include without limitation the Anti-

kickback Statute and the Sunshine Act.

161.    Every Hospital Cost Report also contains a Certification which must be signed by

the chief administrator of the provider or a responsible designee of the administrator.

162.    The CMS Form 2552-10 Hospital Cost Report certification page includes the

following statement:

> Misrepresentation or falsification of any information contained in
> this cost report may be punishable by criminal, civil and
> administrative action, fine and/or imprisonment under federal law.
> Furthermore, if services identified in this report were provided or
> procured through the payment directly or indirectly of a kickback or
> where otherwise illegal, criminal, civil and administrative action,
> fines and/or imprisonment may result.

163.    The cost-report certifier is also required to certify that:

> To the best of my knowledge and belief, this [Hospital Cost Report]
> and statement are a true, correct, complete and prepared from the
> books and records of the provider in accordance with applicable
> instructions, except as noted. I further certify that I am familiar with
> the laws and regulations regarding the provisions of health care
> services, and that the services identified in this cost report were
> provided in compliance with such laws and regulations.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

164.    Thus, by signing CMS Form 2552, a hospital provider is required to and does certify that its cost report was (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that it is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the cost report is based upon all information known to the provider; (4) did not include any services that resulted from an illegal kickback; and (5) the services provided in the cost report were billed in compliance with all provisions of the Stark laws.

165.    As a result of the systematic payment of kickbacks to physicians made with the intent and effect of inducing them to use its spinal surgery products, and Defendants' violations of the Sunshine Act, Defendants caused hospitals to submit claims in violation of conditions of payment and claims with false certifications to the United States.  Claims submitted as a result of illegally-induced surgeries were false claims.

## VIII.   DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY KNOWINGLY CAUSING THE SUBMISSION OF FALSE OR FRAUDULENT CLAIMS OR STATEMENTS

166.    As a party to a Medicaid Rebate Agreement with the United States Secretary of Health and Human Services pursuant to the Social Security Act,  Defendants' medical device products and surgical procedures involving such products are only eligible for reimbursement if and when Defendants are in compliance with applicable federal and state laws.

167.    These laws include, but are not limited to, the federal and corresponding state anti-kickback statutes, the FDMA, the Food, Drug & Cosmetic Act and all related regulations, HIPAA, and the Sunshine Act.  As described in this Complaint, Defendants have been and continue to be in violation of the aforementioned laws.

-39-

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

168.    As described in this Complaint, Defendants have knowingly and repeatedly violated these laws in connection with the use and sale of its medical device products.  These violations have not been incidental, but instead have been central to the Defendants' sales strategy.

169.    Accordingly, Defendants have knowingly caused the false or fraudulent certification of compliance with these federal and state statutes and regulations.

170.    The submission of false or fraudulent certifications of compliance with these statutes and regulations were material to Government Programs' decisions to make reimbursements for Life Spine's medical device products.  Had Government Programs known that the certifications of compliance with the law were false, they would not have made reimbursements for their medical devices.

171.    Defendants' knowingly causing the submission of false certifications of compliance with the law constituted the making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, and this directly caused Government Programs to pay or reimburse for medical device products that were not eligible for payment or reimbursement.

172.    Defendants knew that the certifications of compliance with the law that they knowingly caused to be submitted were false, and that the false certifications would cause Government Programs to make payments for its drugs.

173.    Life Spine's false certifications that Defendants knowingly caused to be submitted have directly caused Government Programs to pay or reimburse for medical device products not eligible for payment or reimbursement.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

### Count I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1);
### 31 U.S.C. § 3729(a)(1)(A))

174.   Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

175.   Defendants knowingly caused to be presented, and may still be knowingly causing to be presented, to the Government false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

176.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### Count II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2);
### 31 U.S.C. § 3729(a)(1)(B))

177.   Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

178.   Defendants knowingly caused to be made or used, and may still be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

179.   The United States, unaware of the falsity of the claims and/or statements made by Life Spine, its physician-consultants, and certain hospitals, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for the Company's medical device products used in surgical procedures for patients enrolled in Federal Programs.

180.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

**Count III**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(3);**
**31 U.S.C. § 3729(a)(1)(C))**

181.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

182.    As detailed above, Defendants knowingly conspired, and may still be conspiring, with health care professionals identified and described herein to commit acts, in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). Defendants and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

183.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

**Count IV**
**(Violation of False Claims Act, 31 U.S.C. § 3730(h))**

184.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

185.    Relator #1, Relator #3, and Relator #4 were engaged in conduct protected under the FCA, including the investigation and reporting of fraud.

186.    Defendants knew that Relator #1, Relator #3, and Relator #4 were engaged in such protected conduct.

187.    Relator #1's, Relator #3's, and Relator #4's termination of employment was because of Relator #1's, Relator #3's, and Relator #4's involvement in the protected conduct, causing Relator #1, Relator #3, and Relator #4 to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

**Count V**
**(Violation of 740 ILCS 175/3)**

188.    Relator #1, Relator #3, and Relator #4 incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

189.    Relator #1, Relator #3, and Relator #4 were engaged in conduct protected by the anti-relation provision of the Illinois False Claims Whistleblower Reward and Protection Act, 740 ILCS 175/4(g), because they were Life Spine employees, and because of their efforts to stop Life Spine's practice of failing to comply with the federal laws, including the Medicare and Medicaid laws, in connection with the illegal sales of Life Spine's medical device products.   Because Medicare and Medicaid are not authorized to pay for devices that cannot be legally sold, Relator #1's, Relator #3's, and Relator #4's efforts to stop Defendants' kickback scheme were efforts to stop violations of the Illinois False Claims Whistleblower Reward and Protection Act, 740 ILCS 175/3.

190.    Life Spine terminated Relator #1, Relator #3, and Relator #4 from their jobs because of lawful acts done by them in furtherance of an action under 740 ILCS 175/4(g)or because of other efforts by Relator #1 to stop a violation of 740 ILCS 175/3.

191.    As a result of Life Spine's wrongful retaliatory conduct, Relator #1, Relator #3, and Relator #4 have suffered substantial financial losses and suffered substantial emotional distress.

WHEREFORE, Relator #1, Relator #3, and Relator #4, on his behalf and pursuant to 740 ILCS 175/4(g), requests that this Court:

(a)    Reinstate Relator #1, Relator #3, and Relator #4 to the same position that they would have had but for the wrongful termination;

(b)    Award Relator #1, Relator #3, and Relator #4 two times the amount of back pay they would have earned but for the retaliation, and interest on that award;

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

(c)     Award Relator #1, Relator #3, and Relator #4 compensation for all special damages they have sustained as a result of Life Spine's termination in violation of public policy.

(d)     Award them their costs and reasonable attorneys' fees for prosecuting their action; and

(e)     Enter such other relief which the Court finds just and equitable.

### Count VI
### (Retaliatory Discharge In Violation of Public Policy)

192.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

193.     Under the common law, Illinois employees have a right to act in good faith to halt harm to the public, to try to prevent conduct that the employee believes will endanger the public. Any type of disciplinary action or termination which is taken in retaliation for such protected conduct is against public policy and constitutes wrongful retaliation or termination.

194.     Relator #1, Relator #3, and Relator #4 were retaliated against for conduct protected under the common law of Illinois.  Conduct which results in the illegal sale of, and reimbursement for, medical devices may constitute a violation of federal and criminal law.  Relator #1, Relator #3, and Relator #4 were retaliated against for trying to prevent the sale and reimbursement of medical devices in violation of federal law, conduct which Relator #1, Relator #3, and Relator #4 believed would endanger the public.

195.     Life Spine's termination of Relator #1, Relator #3, and Relator #4 was in violation of public policy and constitutes wrongful termination.  As a result of the wrongful termination, Relator #1, Relator #3, and Relator #4 have suffered substantial financial losses, and suffered substantial emotion distress.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

WHEREFORE, Relator #1, Relator #3, and Relator #4, on their behalf, requests that this Court:

(f)     Reinstate Relator #1, Relator #3, and Relator #4 to the same position that they would have had but for the wrongful termination;

(g)     Award Relator #1, Relator #3, and Relator #4 the amount of back pay they would have earned but for the retaliation, and interest on that award;

(h)     Award Relator #1, Relator #3, and Relator #4 compensation for all special damages they have sustained as a result of Life Spine's termination in violation of public policy;

(i)     Award them their costs and reasonable attorneys' fees for prosecuting this action; and

(j)     Enter such other relief which the Court finds just and equitable.

## Count VII
### (Violation of Colorado Medicaid False Claims Act)

196.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

197.     This is a civil action brought by Relators, on behalf of the State of Colorado, against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

198.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly caused to be presented, and may still be causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

199.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

200.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

201.    The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of state and state subdivision funded health insurance programs.

202.    As a result of Defendants' actions as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count VIII
### (Violation of Connecticut False Claims Act)

203.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

204.    This is a civil action brought by Relators, on behalf of the State of Connecticut, against Defendants under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 4-277.

205.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

employee of the State of Connecticut, or its political subdivisions, false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(1).

206.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(2).

207.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(7).

208.    The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of state and state subdivision funded health insurance programs.

209.    As a result of Defendants' actions as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

## Count IX
### (Violation of District of Columbia False Claims Act)

210.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

211.     This is a civil action brought by Relators, on behalf of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code § 2-381.03(b)(1)).

212.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381-02(a)(1)).

213.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(2).

214.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(7).

215.     The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance upon the

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of health insurance programs funded by the District.

216.     As a result of Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count X**
**(Violation of Florida False Claims Act)**

217.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

218.     This is a civil action brought by Relators, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

219.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

220.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

221.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

222.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of health insurance plans funded by the State of Florida or its agencies.

223.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**Count XI**
**(Violation of Illinois False Claims Whistleblower Reward and Protection Act)**

224.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

225.    This is a civil action brought by Relators, on behalf of the State of Illinois, against Defendants under the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/4(b).

226.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois, or a member of the Illinois National Guard, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

227.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

or used, false record or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

228.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

229.    The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of state funded health insurance programs.

230.    As a result of Defendants' actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XII
### (Violation of Indiana False Claims and Whistleblower Protection Act)

231.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

232.    This is a civil action brought by Relators, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

233.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

234.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

235.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

236.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of state funded health insurance programs.

237.    As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count XIV**
**(Violation of Maryland False Health Claims Act)**

238.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

239.    This is a civil action brought by Relators, on behalf of the State of Maryland, against Defendants under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-604.

240.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

241.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

242.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

243.    The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for Life Spine's medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

244.    As a result of Defendants' actions, as set forth above, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XV
### (Violation of Massachusetts False Claims Act)

245.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

246.    This is a civil action brought by Relators, on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

247.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(a)(1).

248.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(a)(2).

249.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(a)(8).

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

250.     The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

251.     As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XVI
### (Violation of New Jersey False Claims Act)

252.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

253.     This is a civil action brought by Relators, on behalf of the State of New Jersey, against Defendants pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

254.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

255.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

256.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

257.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of health insurance programs funded by the state or its political.

258.    As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count XVII**
**(Violation of New York False Claims Act)**

259.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

260.    This is a civil action brought by Relators, on behalf of the State of New York, against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 190.

261.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

officer, employee or agent of the State of New York, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

262.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved by the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(b).

263.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

264.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of health insurance programs funded by the state or its political subdivisions.

265.    As to the New York Medicaid program, the state's regulatory regime provides that an "overpayment includes any amount not authorized to be paid under the medical assistance program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." N.Y. Comp.Codes R. & Regs. tit. 18, § 518.1(c). The regime defines "unacceptable practice," to include "[b]ribes and kickbacks," id. § 515.2(b)(5),

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

and lists within this category both "soliciting or receiving," id. § 515.2(b)(5)(ii), and "offering or paying," id. § 515.2(b)(5)(iv), "either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for purchasing, leasing, ordering or recommending any medical care, services or supplies for which payment is claimed under the program," id. § 515.2(b)(5)(ii), (iv). New York's anti-kickback statute forbids kickbacks in similar terms. See N.Y. Soc. Serv. Law §§ 366–d, –f.

266.    As a result of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XVIII
### (Violation of Oklahoma Medicaid False Claims Act)

267.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

268.    This is a civil action brought by Relators, on behalf of the State of Oklahoma, against Defendants pursuant to the Oklahoma Medicaid Fraud False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

269.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

270.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

271.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

272.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of Medicaid.

273.    As a result of Defendant's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

**Count XVIV**
**(Violation of Texas Medicaid Fraud Prevention Act)**

274.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

275.    This is a civil action brought by Relators, on behalf of the State of Texas against, Defendants under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

276.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

277.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

278.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

279.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

280.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements knowingly caused to be made by Defendants, and in reliance on the accuracy of

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of Medicaid.

281.   As a result of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## Count XX
### (Violation of Virginia Fraud Against Taxpayers Act)

282.   Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

283.   This is a civil action brought by Relators, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

284.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

285.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

286.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

287.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made, or knowingly caused to be made, by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Life Spine's medical device products for recipients of state funded health insurance programs.

288.    As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

WHEREFORE, Relators pray for judgment against Defendants as follows:

(a)    That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 et seq.; Colo. Rev. Stat. § 25.5-4-304 et seq.; Conn. Gen. Stat. § 4-274 et seq.; D.C. Code § 2-381.01 et seq.; Fla. Stat. § 68.081 et seq.; Ga. Code Ann. § 49-4-168 et seq.; 740 Ill. Comp. Stat. § 175/1 et seq.; Ind. Code § 5-11-5.5 et seq.; Md. Code Ann., Health-Gen. § 2-601 et seq.; Mass. Gen. Laws ch. 12, § 5A et seq.; N.J. Stat. Ann. § 2A:32C-1 et seq.; N.M. Stat. Ann. § 27-14-1 et seq.; N.Y. State Fin. Law § 187 et seq.; N.C. Gen. Stat. § 1-605 et seq.; Okla. Stat. tit. 63, § 5053 et seq.; Tex. Hum. Res. Code Ann. § 36.001 et seq.; and Va. Code Ann. § 8.01-216.1 et seq.

(b)    That judgment be entered in Relators' favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than $11,181 or more than $22,363 per claim as provided by 31 U.S.C. § 3729(a) and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(c)     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §§ 3730(d) and 3730(h), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 4-278(e), D.C. Code § 2-381.03(f), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i), 740 Ill. Comp. Stat. § 175/4(d), Ind. Code § 5-11-5.5-6, Md. Code Ann., Health-Gen. § 2-605, Mass. Gen. Laws ch.12, § 5F, N.J. Stat. Ann. § 2A:32C-7, Okla. Stat. tit. 63, § 5053.4, Tex. Hum. Res. Code Ann. § 36.110, and Va. Code Ann. § 8.01-216.7, including without limitation (i) reinstatement of Relator #1's, Relator #3's, and Relator #4's employment with no diminution of seniority, (ii) double back-pay for the period since Relator #1's, Relator #3's, and Relator #4's unlawful retaliatory termination, (iii) interest on such back-pay for Relator #1, Relator #3, and Relator #4, and (iv) special damages for Relator #1, Relator #3, and Relator #4, including reasonable attorneys' fees and litigation costs.

(d)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than $11,181 or more than $22,363 for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1) and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(e)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than $11,181 or more than $22,363 for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat.

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

§ 4-275(b)(1) and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(f)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2–381.02, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(g)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(h)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1), plus a civil penalty of not less than $11,181 or more than $22,363 as provided by 740 Ill. Comp. Stat. § 175/3(a)(1) and adjusted for inflation, and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(2), to the extent such penalties shall fairly

compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(i)      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-5.5-2(b), and the costs of this civil action as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(j)      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) for each false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(k)      That judgment be entered in Relators' favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than $11,181 or more than $22,363, plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

damages, as provided by Mass. Gen. Laws ch. 12. § 5B(a) and adjusted for inflation, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(l)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than $11,181 or more than $22,363 as allowed under the federal False Claims Act (31 U.S.C. § 3729 et seq.) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(m)     That judgment be entered in Relators' favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(n)     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than $11,181 or

more than $22,363 as provided by Okla. Stat. tit. 63, § 5053.1(B) and adjusted for inflation, to the

extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political

subdivisions for losses resulting from the various schemes undertaken by Defendants, together

with penalties for specific claims to be identified at trial after full discovery;

        (o)     That judgment be entered in Relators' favor and against Defendants for

restitution to the State of Texas for the value of payments or benefits provided, directly or

indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code Ann.

§ 36.052(a), multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest

on the value of such payments or benefits at the prejudgment interest rate in effect on the day the

payment or benefit was paid or received, for the period from the date the payment or benefit was

paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum.

Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than $11,181 or more than $22,363,

pursuant to Tex. Hum. Res. Code Ann. §§ 36.052(a)(3) and adjusted for inflation, to the extent

such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the

various schemes undertaken by Defendants, together with penalties for specific claims to be

identified at trial after full discovery;

        (p)     That judgment be entered in Relators' favor and against Defendants in the

amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in

Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred

dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. §

8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth

CONFIDENTIAL – SUBJECT TO JOINT INVESTIGATION
PRIVILEGE – MATTER TO BE FILED UNDER SEAL

of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(q) That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

(r) That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit; and

(s) That Relators be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relators demand a trial by jury of all issues so triable.

Dated: February 14, 2018

SEEGER WEISS LLP

Stephen A. Weiss
Christopher L. Ayers
77 Water Street, 26th Fl.
New York, NY 10005
Tel: 212-584-0700
Fax: 212-584-0799

-68-

**EXHIBIT A**

**Life Spine Physicians-Consultants**

| DOCTOR NAME | LOCATION |
|---|---|
| Alexander Bailey | Overland Park, KS |
| Alexandra Carrer | San Francisco, CA |
| Amir Vokshoor | Marina Del Rey, CA |
| Andrew Annestra | Jacksonville, FL |
| Andrew Cappuchino | Lockport, NY |
| Andrew Sama | New York, NY |
| Bradley Bagan | Belair, MD |
| Bryan Beertoglio | Hoffman Estates, IL |
| Cheng Lun Soo | Oklahoma City, OK |
| Christopher Hubbard | Louisville, KY |
| Darren Lebl | New York, NY |
| David Jones | Hickory, NC |
| David Lee | Haittesburg, MS |
| Dennis Bullard | Raleigh, NC |
| Dilantha Ellegala | Lynchburg, VA |
| Faisal Siddiqui | Fredericksburg, VA |
| Fraser Henderson | Silver Spring, MD |
| Frederick Junn | Oregon, OH |
| Glenn Butterman | Maple Grove, MD |
| Hector Vargas-Soto | Mayaguez, PR |
| Henry Small | Pearland, TX |
| Hyun Bae | Santa Monica, CA |
| James Rice | Portsmouth, OH |
| Jason Montone | North Kansas City, MO |
| Jefrey Gum | Louisville, KY |
| John Anson | Las Vegas, NV |
| John Dimar | Louisville, KY |
| John Drygas | St. Petersburg, FL |
| Joseph Shehadi | Dayton, OH |
| Joshua Abrams | Green Valley, AZ |
| Juan Dinkins | Dickson, TN |
| Juan Valdivia | St. Petersburg, FL |
| Kevin Brown | Ironton, OH |
| Louis Rosa | Starkville, MS |
| Marsha Lucas | Greenwood, MS |
| Matthew Hannibal | Boone, NC |
| Michael Broom | Orlando, FL |

| DOCTOR NAME | LOCATION |
|---|---|
| Michael Kapsokavathis | Birmingham, MI |
| Michael Molleston | Jackson, MS |
| Michael S. Chang | Mesa, AZ |
| Michael Schneier | Las Vegas, NV |
| Michael Seiff | Las Vegas, NV |
| Michael Shannon | Zanesville, OJ |
| Muhammed Memon | Port Charlotte, FL |
| Nilesh M. Patel | Dearborn, MI |
| Paul Klutts | Louisville, KY |
| Paul Vaughan | Houston, TX |
| Ra'Kerry Rachman | Springfield, IL (previous)<br>Houston, TX (current) |
| Rebecca Kuo | Channahon, IL |
| Richard Mendel | St. Petersburg, FL |
| Robert Hirschle | Orlando, FL |
| Robert Knetsche | Danville, KY |
| Roger Shortz | San Diego, CA |
| Sameer Mathur | Morrisville, NC |
| Scott Peterson | Parkland, FL |
| Sean Markey | Parker, CO |
| Simon Chao | Raynham, MA |
| Steven Zeiller | Tuscon, AZ |
| Stuart Kaplan | Las Vegas, NV |
| Thomas Loftus | Austin, TX |
| Thomas Scully | Tuscon, AZ |
| Timothy Putty | Tuscon, AZ |
| Victor Hayes | Odessa, FL |
| Vincent Leone | Ridgewood, NY |
| Vittorio Morreale | Shelby Twp., MI |
| Zaki Ibrahim | Centinnel, CO |
| Zeshan Hyder | Merrillville, IN |